Hearing:
December 17, 2008

**THIS OPINION IS A PRECEDENT OF THE TTAB**

Mailed:
March 4, 2009
Bucher

**UNITED STATES PATENT AND TRADEMARK OFFICE**

———

**Trademark Trial and Appeal Board**

———

In re UDOR U.S.A., Inc

———

Serial No. 78867933

———

Michael B. Lasky of Altera Law Group LLC for UDOR U.S.A., Inc.

Shaila E. Settles, Trademark Examining Attorney, Law Office 114 (K. Margaret Le, Managing Attorney).

———

Before Walters, Bucher and Drost, Administrative Trademark Judges.

Opinion by Bucher, Administrative Trademark Judge:

Applicant seeks registration on the Principal Register

of the following alleged mark:



for goods identified in the application as "metal spray nozzles" in International Class 6.[1]

The Trademark Examining Attorney refused registration on the ground that this three-dimensional product design configuration is functional for the identified goods under Trademark Act Section 2(e)(5), 15 U.S.C. § 1052(e)(5),[2] and on the ground that the proposed mark consists of a nondistinctive product design, and thus does not function as a mark under Trademark Act Sections 1, 2, and 45, 15 U.S.C. §§ 1051, 1052 and 1127.

After the Trademark Examining Attorney made these refusals final, applicant appealed to this Board. Applicant and the Trademark Examining Attorney have fully briefed the case, and both were represented at a hearing held before this panel of the Board on December 17, 2008.

We affirm the refusals to register.

---

[1]   Application Serial No. 78867933 was filed on April 24, 2006 based upon applicant's allegation of a *bona fide* intention to use the mark in commerce.  The mark consists of a round disk head on a sprayer nozzle.

[2]   No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it -- … (e)(5) comprises any matter that, as a whole, is functional.
15 U.S.C. § 1052(e)(5).

## *Is this product design configuration functional?*

The first question before us it whether the applied-for design consists of a functional configuration of a metal spray nozzle.  This determination is a question of fact, and depends upon the totality of the evidence presented in each particular case.  *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 58 USPQ2d 1001, 1005 (2001). *See also In re Morton-Norwich Products, Inc.*, 671 F.2d 1332, 213 USPQ 9 (CCPA 1982); *In re American National Can Co.*, 41 USPQ2d 1841 (TTAB 1997); *In re Honeywell Inc.*, 8 USPQ2d 1600 (TTAB 1988); and *In re Weber-Stephen Products Co.*, 3 USPQ2d 1659 (TTAB 1987).  The Supreme Court's decision in *TrafFix* has not altered the *Morton-Norwich* analysis.  *See Valu Engineering, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 61 USPQ2d 1422, 1427 (Fed. Cir. 2002).

> **(1)  Morton-Norwich factor one:  the existence of a utility patent that discloses the utilitarian advantages of the design sought to be registered**

The United States Supreme Court in *TrafFix* held that if the product design configuration sought to be registered as a mark is the subject of a utility patent that discloses the feature's utilitarian advantages, then the one who seeks to establish trade dress protection bears an especially "heavy

burden of overcoming the strong evidentiary inference of functionality." *TrafFix Devices*, 58 USPQ2d at 1005.

In the case of an *ex parte* appeal, provided the Trademark Examining Attorney has made out a *prima facie* case that the claims of a utility patent disclose the utilitarian advantages of the trademark design sought to be registered, the burden shifts to applicant to demonstrate that the product design configuration is not functional, such as by presenting evidence that the features shown in the alleged trademark are merely ornamental, incidental, or arbitrary aspects of the product. *Id. See also In re R.M. Smith*, 734 F.2d 1482, 222 USPQ 1, 3 (Fed. Cir. 1984); and *In re Bio-Medicus Inc*., 31 USPQ2d 1254, 1257 n.5 (TTAB 1993).

Applicant is the owner of a utility patent that has been made a part of this record (U.S. Patent No. 7,108,204). The "abstract" for the '204 patent contains the following summary of the invention:

> A spray nozzle includes an orifice disposed on a substantially planar discharge surface. An impingement surface is disposed opposite the orifice, the impingement surface forming an angle with a centerline of the orifice. The angle between the orifice centerline and the surface is less than 90 degrees. A deflection ridge bridges a gap between the impingement surface and the discharge surface. The deflection ridge encompasses a partial circumference of the nozzle. The nozzle includes a fluid fitting adapted for providing a pressurized fluid to the orifice.

The utility patent must be examined carefully to determine whether it reveals utilitarian aspects of

applicant's configuration design. The "background of the invention" is set forth as follows:

> Spray nozzles used for dispersing fluids are well known. In agricultural applications, nozzles that can evenly disperse a liquid agent (fertilizer, insecticide, water, etc.) are especially useful. The accuracy and consistency of nozzle spray patterns are important in modern systems due to advances in the agricultural sciences. For example, satellite surveys of fields can be used to direct GPS located vehicles for the accurate dispersion of agents on a crop, the dispersion pattern based on an analysis of the satellite survey. Given the precise distribution required by such a system, a nozzle that can accurately and consistently deliver an agent over a given area is highly desirable.
> Flow through nozzles is typically quite turbulent. In the case of a liquid being discharged into the atmosphere, two-phase fluid interface conditions also exist. As a result, accurate modeling of nozzle performance by analytical means is highly complex, and may not [be] feasible. Therefore, optimization of nozzle performance generally requires testing various geometries by trial and error. In such testing, seemingly innocuous changes to geometry can make a significant difference in nozzle performance.
> There is a need for a spray nozzle with superior dispersion characteristics. Especially desirable is a nozzle that can evenly distribute a fluid over the nozzle's spray area. The present invention fulfills these and other needs, and provides several advantages over prior spray nozzle systems.

A number of advantages of applicant's spray nozzles become clear as one reads applicant's '204 utility patent and reviews applicant's literature and other documents and evidence of record.

From the language of the '204 patent we see that one of the features of applicant's nozzle is the removable nozzle head. One is able then to change spray patterns by changing merely the head on the nozzle, rather than having to change

the entire body of the nozzle down to the fluid fitting. According to the background of this invention, the claimed product design permits more even and more accurate dispersion of fluid chemical agents over a larger area than was possible with previous nozzle designs. With the ease of disassembly, it appears this design provides for easier cleaning of the nozzle heads, while also preventing clogging.

The drawing (Fig. 1) from the patent shown at left below is a side view of the entire nozzle. We find it helpful to compare the identified features of the patent drawing with the visible features of the trademark drawing. In the center image below, we have identified the relevant features of the trademark drawing as labeled in the patent text and drawing. The visible features of the trademark configuration design include the removable spray nozzle head appearing as a round-disk shape on the very top, the orifice as positioned in the discharge surface of the nozzle body, and the gap between the body and the head through which the fluid exits the nozzle. The relevant features of the patented device not shown in the trademark drawing include the screw fastener, the impingement surface (creating an impingement angle of 85° to 90°), a filleted corner or sharp corner deflection ridge or a sharp ridge (figure on the

right below, an enlarged side view of the nozzle head

extracted from Fig. 1).



Trademark Image altered to identify
patent features

Patent features from Fig. 1 not
shown in trademark configuration

These latter features, plus additional ones described

in the patent but not visible in the trademark design, are

shown in additional patent drawings.



These are reproductions of two inverted perspective views of the nozzle head, reflecting two different embodiments – Fig. 3 for spray angles from 80° to 120° and Fig. 6 for spray angles from 180° to 220° (again, word labels have been substituted for the numbers in the patent drawings for the sake of easier identification herein).

When one compares these patent drawings with the trademark drawing, the features of the patented device not visible in the trademark drawing include the impingement surface, the deflection ridges having a sharp corner and/or filleted corner(s), and in figure 3, the spherical indentation and sharp ridge.

As to the exact nature of the discharge of fluids through the gap, the essence of applicant's patent seems to be captured in a discussion reflecting the complexities of fluid mechanics.  Applicant appears to have tuned the flow component from the impingement surface with the flow component of the deflection ridges:

> The fluid plume exiting the nozzle is formed of two flow components.  The first flow component is impingement flow that directly exits the nozzle 1.  The second flow component includes impingement flow that hits the deflection ridge 7 and is thereby deflected out the nozzle 1.  Since these two flow components have different paths, they will achieve different states (e.g., velocities) when exiting the nozzle 1.  By careful design of geometric features (e.g., size and shape of the impingement surface 5 and deflection ridge 7), these two flow components can be tuned such that the resultant flow has even dispersion characteristics over an area covered by the nozzle plume.

- 8 -

U.S. Patent No. 7,108,204, *DETAILED DESCRIPTION OF THE VARIOUS EMBODIMENTS*, unnumbered ¶ 5.

As we understand the teachings of this utility patent, it is clear that the spray patterns of these removable/ changeable nozzle heads are determined by rather complex principles of physics.  Combinations of the design of several key internal features result in the interaction of several fluid streams, with fluid velocities and dispersion patterns calibrated to set pressures.  While we do not purport to understand fluid mechanics, we accept the teachings of this patent that the tuned interaction of pressurized fluids hitting an impingement surface and the deflection ridges determines the variety of dispersion patterns of these various nozzle heads.  These features are internal, largely non-visible components of the spray nozzle that are neither shown nor described in the trademark drawing, and some of which are not readily apparent without disassembly of the spray nozzle.

Nonetheless, the Trademark Examining Attorney argues that the external round shape of the spray nozzle head as shown on the front-page drawing of the '204 patent helps to form the discharge pattern of the fluid.  We disagree.

We find that the Trademark Examining Attorney has not demonstrated convincingly that the round shape of the nozzle

head has inherent utilitarian value based upon the claims of the patented technology.  The product features shown and described in the trademark configuration design do not serve a function within the terms of the utility patent, and are not shown as useful parts of the claimed invention.  While it is true that all the embodiments depicted in drawings in the patent do involve a round head, none of the utility patent claims refers to a rounded spray nozzle head.  Rather it is the design of the impingement surface and the deflection ridges alone that determines the discharge pattern of the fluid from each nozzle head.  The novel and non-obvious features claimed for this patented spray nozzle would function identically, irrespective of the shape of the portion of the spray nozzle head visible in the trademark product design configuration.  Hence, we find that the Trademark Examining Attorney's argument that the round shape of the nozzle head helps to form the discharge pattern of the fluid is not supported by the patent or the prior art.

Accordingly, inasmuch as the claims of the relevant utility patent involve components not visible in the trademark configuration design, we find that the Trademark Examining Attorney has failed to make a convincing case under this important *Norton-Norwich* factor.

### *(2) Morton-Norwich factor two: any advertising by the applicant that touts the utilitarian advantages of the design*

In some reported decisions, an applicant's claims of the non-functionality of its proposed product design configuration made during prosecution are contradicted by the applicant's own marketing claims that prominent features of the product design are the very reason why the applicant's involved product is superior to that of the competition. However, a review herein of this applicant's advertisements does not reveal that it has touted the utilitarian advantages of the product design configuration sought to be registered. For example, while applicant repeatedly points to the patented advantages of its spray nozzles, all of the applicant's advertisements made part of this record use the round disk shape of the head exactly as one would anticipate in "look for" advertising. The text states that "YOU CAN TELL IT'S A BOOMINATOR NOZZLE ON SIGHT," and that "Boominator's® unique round head shape lets you know it is a genuine Boominator® nozzle…"



Accordingly, we find nothing in the record to support a refusal of applicant's design based upon any advertising by the applicant touting the utilitarian advantages of the product design configuration of its spray nozzle.

### (3) Morton-Norwich factor three: facts pertaining to the availability of alternative designs

In determining whether a feature is functional, this factor of the *Morton-Norwich* test considers the availability to competitors of feasible alternative designs – i.e., whether the product design configuration is superior to other designs. The Trademark Examining Attorney and applicant gave this factor relatively-short shrift during the prosecution of this application. However, regarding the third *Morton-Norwich* factor, the Court of Appeals for the Federal Circuit has explained that:

> We did not in the past under the third [*Morton-Norwich*] factor require that the opposing party establish that there was a "competitive necessity" for the product feature. Nothing in *TrafFix* suggests that consideration of alternative designs is not properly part of the overall mix, and we do not read the Court's observations in *TrafFix* as rendering the availability of alternative designs irrelevant. Rather, we conclude that the Court merely noted that once a product feature is found functional based on other considerations there is no need to consider the availability of alternative designs, because the feature cannot be given trade dress protection merely because there are alternative designs available. But that does

> not mean that the availability of alternative designs cannot be a legitimate source of evidence to determine whether a feature is functional in the first place.

*Valu Engineering, Inc. v. Rexnord Corp.*, 61 USPQ2d at 1427 (footnote omitted).

With respect to this third evidentiary factor, applicant argues that "[t]here are any number of alternate designs for the equivalent of Applicant's distinctive spray design."[3] Yet, while applicant says that its competitors offer different, alternative shapes of spray nozzle heads, none is explored, and from this record, none is readily apparent. There is certainly no point in our speculating about hypothetical alternatives that would appear to us immediately to be "unfeasible, uneconomical or otherwise disadvantageous." *In re Bose Corporation*, 215 USPQ 1124, 1127 (TTAB 1982).

On the other hand, the record does show that applicant's competitors who manufacture and market spray nozzles have quite similar nozzles with round heads, some kind of impingement surface, and a gap where a pressurized, fluid plume can escape out the side of the head in an angled/fan spray. When viewed in their entireties, none looks precisely like applicant's spray nozzle in overall

---

[3] Declaration of Thomas Les Johnson, applicant's co-owner, ¶ 4, April 27, 2007.

size of the nozzle, or as to the relative size of the round disk head compared with the fluid opening, hexagonal tightening surface and/or the fluid fitting.  However, the record has pictures and descriptions of metal spray nozzles that are visually and functionally quite similar to applicant's nozzle, including, *inter alia*, Bex spray nozzles,[4] AllSpray nozzles,[5] Spraying Systems Company (UK) nozzles,[6] Delavan AG Products nozzles,[7] and Lechler flat fan nozzles,[8] all depicted below:



Applicant' spray nozzle

Bex® spray nozzle

Spraying Systems Company (UK) nozzle

AllSpray nozzle

Dalavan AG Products nozzle

Lehler® flat fan nozzle

Yet in the declarations submitted by applicant, in its briefing for a final decision, and during the oral arguments, applicant made much of the fact that while it is a dominant player in the market of "boomless spray nozzles," and argued that many of these third-party nozzle

---

[4]    http://www.bex.com/products/flat/flat.html

[5]    http://allspray.com/prod_cat.aspx?id=50

[6]    http://en.spray.com/asp/cat70/c/C29.html

[7]    http://www.delavanagspray.com/Products-a7.htm

[8]    http://www.lechlerusa.com/products/flat_fan_6.asp

configurations are irrelevant to our determination herein because they reflect products in the market of nozzle tips for boomed spraying.  While we understand and appreciate the stated differences, we find this distinction to be irrelevant to our decision herein.  Even if these were not in any way competing products, we note that the identification of goods clearly does not limit applicant's goods to boomless spray nozzles.  Accordingly, when looking at the competitive field of alternative designs, we must consider boomed as well as boomless nozzles shown in the record.[9]

Accordingly, it seems clear that a spray nozzle having a round head, some kind of impingement surface, and a gap where the fluid plume can escape out the side of the nozzle does not comprise an arbitrary flourish in the configuration of metal spray nozzles.

Apart from the basic mathematical principle that a circular design provides the largest cross-section of a plane while minimizing the perimeter, it appears from the record that this round head is the preferred shape of a metal spray nozzle tip.  This would appear to be an obvious conclusion from the standpoint of design, manufacture,

---

[9]     We should make clear that we are making no finding as to whether this consideration would come out differently in the event this hypothetical distinction were indeed a part of the record.

storage, shipping and handling.  By contrast, had applicant adopted, as an intentional alternative to the usual, round nozzle tip an unusual head configuration, then that choice may well have resulted in increased costs and major inefficiencies in the manufacturing and shipping processes. Such a hypothetical design would arguably present a much stronger case for being a non-functional source-identifier – a shape that is "uneconomical or otherwise disadvantageous." *Bose Corp.*, 215 USPQ at 1127.

Furthermore, while in our analysis of the claims in applicant's utility patent we did not find relevant the Trademark Examining Attorney's imagery of creating a spray by putting one's thumb on the end of a garden hose, that analogy appears to fit with the ubiquity of an angled impingement surface opposite the orifice where the pressurized fluid escapes directly out from the fluid fitting, the redirected flows needing a gap where the fluid can escape out the side of the nozzle in an angled/fan spray.

Moreover, as an aside, it is interesting that the single-most-obvious feature distinguishing applicant's nozzle head from those shown above is the screw fastener in the removable head.  While this is shown prominently in the patent, and is consistently drawn in the sketches displayed

in applicant's "look for" advertising, it is entirely absent from the trademark drawing.[10]

Finally, we view with some skepticism the form declarations of Ken Vahle, Richard J. Miller, Walter Byrd and Orvice L. Rozell stating in identical wording, "Most spray nozzles appropriate to this purpose have a vastly different shape." This is contradicted by the weight of the record. As seen above, assuming as correct applicant's contention that spray nozzle purchasers must take care in selecting a nozzle, picking the nozzle with a round head will certainly not limit one to applicant's goods.

Accordingly, we find that this points supports a finding of functionality in the product design configuration.

### (4) Morton-Norwich factor four: facts pertaining to whether the design results from a comparatively simple or inexpensive method of manufacture

The Supreme Court in *TrafFix* also reaffirmed the traditional rule of *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 214 USPQ 1 (1982), that "a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or

---

[10] Again, we are not suggesting that the outcome of this proceeding would be different with this hypothetical change in the drawing and description.

quality of the article." *TrafFix*, 58 USPQ2d at 1006. The reference to a product feature being functional "if it affects the cost or quality of the article" mirrors the final factor in the *Morton-Norwich* analysis.

Applicant argues that the round head shape of its spray nozzle is not easier or less expensive to manufacture than other designs and that this chosen shape is superfluous to its function. In support of this proposition, applicant points to paragraph 9 of the declaration of Thomas Les Johnson, which includes the assertion that applicant's design configuration is not the most inexpensive design from a manufacturing standpoint, and that there are no manufacturing or cost benefits related to that particular design. We are skeptical of this conclusory statement. To the contrary, as in our discussion above of the third *Morton-Norwich* factor, we conclude that the round disk shape of applicant's nozzle head appears to be efficient, economical and advantageous.

As to applicant's argument for registrabililty based upon its choice of stainless steel as material composition of the nozzle head, this appears to be totally irrelevant to our determination herein. Applicant has not claimed the color of stainless steel, and it is not clear in the context of this product design configuration that applicant could

- 18 -

even claim stainless steel material as a feature of the

mark.  Yet applicant's brief points out the extra cost of

making this round head shape "of expensive stainless steel."

However, even if stainless steel were somehow shown to be a

legitimate feature of this mark, the Broyhill article on

spray nozzles and nozzle tips entitled "Education & News"

placed into the record shows that whether the focus is

nozzle bodies or nozzle heads/tips, stainless steel is the

"recommended" material to resist wear and corrosion of

abrasive and corrosive chemical agents.

---

**Nozzle & Tip Material**

It is important to select nozzles made of the type of material that will resist wear and corrosion when used as recommended.  Nozzle material is discussed under (1) materials for nozzle bodies and caps and (2) materials for nozzle tips.

(**1) MATERIALS FOR NOZZLE BODIES AND CAPS.**  The materials most often used for the nozzle body and cap are as follows:

> **Stainless Steel.**  Recommended for use with all spray materials and fertilizer.
> **Nylon.**  Resist corrosion and abrasion.  Swells when exposed to some solvents.
> **Aluminum.**  Subject to corrosion.  Has short thread life.
> **Brass.**  Not resistant to abrasive materials such as wettable powders.

**(2) MATERIALS FOR NOZZLE TIPS.**  Materials commonly used for the nozzle tip are as follows:

> **Hardened Stainless Steel.**  Most wear-resistant of any of the readily available metals.
> **Stainless Steel.**  Excellent wear resistance with either corrosive or abrasive materials.
> **Nylon.**  Resists corrosion and abrasion. Swells when exposed to some solvents.
> **Brass.**  Wears quickly when used to apply abrasive materials such as wettable powders.
> **Ceramic or Porcelain.**  Highly resistant to abrasion and corrosion.
> **Kematal.**  Excellent chemical and wear resistance to abrasive chemicals. Approximately 11% longer life than stainless steel.

Hence, we find that this fourth *Morton-Norwich* factor

also weighs against the applicant.

Accordingly, when applying the *Morton-Norwich* factors to this case, we find that under the third and fourth factors, the record establishes a *prima facie* case of functionality in the product design configuration. Applicant, to prevail, must rebut this *prima facie* case with competent evidence. *In re Teledyne Industries, Inc.*, 696 F.2d 968, 217 USPQ 9, 11 (Fed. Cir. 1982); and *In re R.M. Smith, Inc.*, 734 F.2d 1482, 222 USPQ 1, 3 (Fed. Cir. 1984). In that regard, we find that applicant has failed to rebut this showing. Accordingly, based upon the functionality of the individual features comprising the involved configuration design, we conclude that the design as a whole is functional. *Teledyne*, 217 USPQ at 11.

When confronted with a novel, non-traditional trademark, the decision-maker is compelled to focus upon whether exclusive use of this claimed feature "would put competitors at a significant non-reputation based disadvantage."[11] We keep in mind that the reason the functionality rejection exists is, as stated in *Morton-Norwich*, because:

> [T]he public policy involved in this area of the law [is], not the *right* to slavishly copy articles which are not protected by patent or copyright, but the *need* to copy those articles, which is more properly termed the

---

[11]     *Qualitex Co. v. Jacobson Prods. Co*. 514 U.S. 159, 165, 34 USPQ2d 1161, 1164 (1995).

> right to compete *effectively*. [*emphasis* in original]

*Morton-Norwich*, 213 USPQ at 14.

Furthermore, the decision-maker should ensure that one who seeks to establish trade dress protection in a product configuration does not stifle competition due to uncertainty about exactly which non-patentable product designs adopted by the junior user might comprise infringing trademark configurations.

> A registration of the instant configuration without any formal description of applicant's mark or explanation of the elements which applicant claims function as its mark would, we believe, hinder competitors who would not know if the features which they are using in their products, whose overall configurations are not dissimilar from that of the applicant, subject them to a suit for trademark infringement.

*In re R.M. Smith, Inc.*, 219 USPQ 629, 633-34 (TTAB 1983), *aff'd*, *In re R.M. Smith*, 734 F.2d 1482, 222 USPQ 1 (Fed. Cir. 1984).

Therefore, we find that applicant's proposed mark is functional.

## *Is the evidence in support of acquired distinctiveness sufficient to overcome the refusal of non-distinctiveness?*

In the event that applicant should ultimately prevail on the question of functionality, we turn to the question of whether applicant's evidence in support of its claim of acquired distinctiveness is sufficient to overcome the refusal grounded in Trademark Act Sections 1, 2 and 45, that the proposed three-dimensional mark comprises a non-distinctive product design.

The Trademark Examining Attorney is correct in arguing that product design marks, even if found to be non-functional, may be registered only upon a showing of acquired distinctiveness. *Wal-Mart Stores Inc. v. Samara Brothers Inc.*, 529 U.S. 205, 54 USPQ2d 1065, 1068-69 (2000); and *In re Slokevage*, 441 F.3d 957, 78 USPQ2d 1395, 1398 (Fed. Cir. 2006). Accordingly, applicant has argued that this product design trade dress has acquired distinctiveness as a source indicator.

In order to meet its *prima facie* burden on this refusal, the U.S. Patent and Trademark Office must, at a minimum, set forth a "reasonable predicate" for its position of non-distinctiveness. *In re Pacer Technology*, 338 F.3d 1348, 67 USPQ2d 1629, 1632 (Fed. Cir. 2003). We find that the Trademark Examining Attorney has met this burden.

The third-party nozzle designs sprinkled throughout this record are clearly probative of the fact that consumers would not find applicant's spray nozzle head design as presented in the trademark drawing to be unique or unusual. We also agree with the Trademark Examining Attorney that given the nature of this alleged mark, a mere claim of five years of use is insufficient to overcome this showing. Analogizing to the possible registrability of highly descriptive terms which may nevertheless acquire distinctiveness, we note that the lesser the degree of inherent distinctiveness, the heavier the burden to prove it has acquired distinctiveness. *Cf*. *Yamaha International Corp. v. Hoshino Gakki Co. Ltd*., 840 F.2d 1572, 6 USPQ2d 1001, 1008. *See also In re Bongrain International (American) Corp*., 894 F.2d 1316, 13 USPQ2d 1727, 1728 n.4 (Fed. Cir. 1990). We have seen that this product design comprises an ordinary device such that many third parties are using similarly-shaped configurations. As with a highly-descriptive literal mark, a registration may not issue except upon a substantial showing of acquired distinctiveness. *In re D.C. Comics, Inc*., 689 F.2d 1042, 215 USPQ 394, 401-02 (CCPA 1982) (J. Nies, concurring).

In the face of this refusal, applicant's evidence of acquired distinctiveness consists of a statement from applicant's co-owner, Thomas Les Johnson, the statements

of sprayer equipment manufacturers/distributors, and advertising material from six spray nozzle retailers.[12]

First, we find that the absence of any affidavits or declarations from the ultimate users of applicant's goods undermines applicant's contention that the configuration of this spray nozzle head is recognized as a source indicator for this line of spray nozzles.  Under the circumstances of this case, when focusing on who comprises the "public," we find that it includes the ultimate purchasers/users of spray nozzles as well as spray nozzle and sprayer equipment distributors and retailers.[13]

In any case, even somewhat sophisticated intermediaries – e.g., manufacturers of spraying apparatus, or distributors/retailers of spray nozzles – who are looking for spray nozzles characterized by round

---

[12]    Of course while the NSTOCK.biz online advertisement, for example, shows photographs of the involved nozzles, it contains no "look for" notice.

[13]    By analogy to literal marks, our principal reviewing Court held that under the 1984 amendment to the Lanham Act, the test of whether "touchless" is a trademark for auto washing services or is the generic name of a type of auto wash service is its meaning to consumers who use the services, *not solely* to operators and manufacturers of auto wash equipment. *Magic Wand, Inc. v. RDB, Inc.*, 940 F.2d 638, 19 USPQ2d 1551 (Fed. Cir. 1991).  *See also In re Northland Aluminum Products, Inc.*, 777 F.2d 1556, 227 USPQ 961 (Fed. Cir. 1985) (when the issue is genericness to the consuming public, evidence that professionals view the term as a trademark is not probative).

heads, some kind of impingement surface, and a gap where a fluid plume can escape out the side of the head – will still have to look to other indicia to distinguish among manufacturers as this unremarkable combination of external design features cannot be deemed to comprise arbitrary flourishes in the configuration of metal spray nozzles.

In this regard, the practices in the trade and the realities of the marketplace would be most relevant in assessing applicant's burden of proving that its product design configuration has become distinctive as a source-indicator.  Typically, more evidence is required if the proposed mark is a design frequently used in the industry.  In this case, consumers will be less apt to perceive source-indicating significance from the use of applicant's design.

As to the industry declarations, the existence of a relatively small number of people who have stated that they associate the alleged mark with applicant is simply insufficient in this case for us to find that the term functions as a trademark for applicant's goods.  *See In re Dimitri's Inc.,* 9 USPQ2d 1666 (TTAB 1988).  Focusing on the stated opinions of the distributors and retailers of spray nozzles, the underlying factual basis for their conclusory statements is not apparent.  Given this weakness, the

declarations do not suffice to prove that applicant's design has acquired distinctiveness as a source-indicator.

As noted earlier, applicant's burden is heightened in view of the fairly-ordinary nature of the spray nozzle head as used by applicant, and given the strong similarity between applicant's overall product design and that of the third parties demonstrated in the record. In this context, we are not persuaded that applicant has managed to create consumer recognition of this design as a source-indicating trademark. *See In re Kwik Lok Corp.*, 217 USPQ 1245 (TTAB 1983). A commensurately greater amount of evidence would be required to establish that this particular design has acquired distinctiveness for applicant's spray nozzle heads. *See In re Anton/Bauer Inc.*, 7 USPQ2d 1380, 1383 (TTAB 1988).

In applicant's favor, it does appear as if applicant has employed some "look for" advertising. However, the declaration of applicant's co-owner, Thomas Les Johnson, contains no evidence of the overall level of this "look for" advertising activity. Furthermore, the record does not reveal any measure of its effectiveness. Accordingly, we do not find convincing applicant's purported evidence of the effectiveness of its attempts to cause the purchasing public to identify the alleged mark with the source of the

product.  See *In re Owens-Corning Fiberglas Corp*., 774 F.2d 1116, 227 USPQ 417, 422 (Fed. Cir. 1985).

Additionally, there is no evidence in Mr. Johnson's declaration or elsewhere in the record as to the extent of applicant's sales of goods under the alleged mark, either in terms of dollars or units.  Inasmuch as we have rejected the distinction applicant makes between the boomless and boomed sprayer equipment markets, applicant's claim of 33% of the boomless spray nozzle market is neither relevant nor probative on this issue.

Therefore, applicant's evidence in support of the claim of acquired distinctiveness is insufficient to overcome the finding that applicant's proposed configuration mark fails to function as a source-indicator.  Consequently, the refusal of registration of the proposed configuration mark on the ground that the proposed mark comprises a configuration of the goods that has not been shown to have acquired distinctive is affirmed under Trademark Act Sections 1, 2, and 45, 15 U.S.C. §§1051, 1052, and 1127, and we reject applicant's claim of entitlement to registration on the Principal Register.

*Decision*:  Based upon all the evidence of record, we affirm the refusal of registration pursuant to Trademark Act Section 2(e)(5) on the ground that the proposed product design configuration mark is functional.  In the alternative, we also affirm the refusal under Trademark Act Sections 1, 2, and 45 on the ground that the proposed configuration mark fails to function as a source-identifier.